UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

EMILY ST. CLARE,                        )
     *Plaintiff*,                        )
                                       )
     *vs.*                              )     1:11-0067-JMS-MJD
                                       )
UNUM LIFE INSURANCE COMPANY OF          )
AMERICA, *et al.*,                      )
     *Defendants*.                      )

## <u>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT</u>

Plaintiff Emily St. Clare alleges that Defendants Unum Life Insurance Company of America ("<u>Unum</u>") and Noble Investment Group Plan (the "<u>Plan</u>") wrongfully denied her request for long-term-disability benefits in contravention of the Employee Retirement Income Security Act ("<u>ERISA</u>"). 29 U.S.C. § 1001 *et seq*. Presently pending before the Court are the parties' cross-motions for summary judgment. [Dkts. 55; 68.] For the reasons explained herein, the Court enters summary judgment in favor of the Defendants.

## I.
## BACKGROUND[1]

### A. Ms. St. Clare's Employment at Noble Investment Group

Ms. St. Clare began working as an interior design manager at Noble Investment Group, LLC ("<u>Noble</u>"), on November 26, 2007. [Dkt. 41 at 67.] Her approximate monthly salary was $6,250. [Dkt. 41-1 at 52.]

While employed at Noble, Ms. St. Clare participated in the available employee benefit plan that provided disability benefits to employees who met certain conditions and were unable

---

[1] The Court held oral argument on the parties' cross-motions for summary judgment on March 23, 2012. The Court commended counsel on both sides for the thorough and civil nature of the briefing.

- 1 -

to work.  [Dkts. 1 at 2; 20 at 2.]  In relevant part, the Plan provides that as proof of a claim, an employee must show "that you are under the regular care of a physician."  [Dkt. 41 at 81.]  The Plan defines "regular care" to mean:

> • you personally visit a physician as frequently as is medically required, according to generally accepted medical standards, to effectively manage and treat your disabling condition(s), and
>
> • you are receiving the most appropriate treatment and care which conforms with generally accepted medical standards, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

[Dkt. 41 at 116.]

In March 2009, Ms. St. Clare stopped work on the advice of her doctor due to what she reported to Unum to be fibromyalgia, migraines, and allergies.  [Dkt. 41 at 64.]  Ms. St. Clare reported that her symptoms had been present for six weeks.  [*Id.*]  She was approximately thirty-five years old at the time.  [Dkt. 41-2 at 38.]  A vocational analyst subsequently concluded that Ms. St. Clare's job required the physical demands of light work.  [Dkt. 41-2 at 43.]

**B. Relevant Treatment During Short-Term-Disability Claim Review**

On April 9, 2009, Ms. St. Clare filed a claim for short-term-disability ("STD") benefits with Unum.  [Dkt. 41 at 64.]  She submitted an Attending Physician's Statement ("APS") from Dr. Susan Tanner to support her claim.  [Dkt. 41 at 61-62.]  Dr. Tanner, a specialist in environmental medicine, reported that she had been treating Ms. St. Clare in Alpharetta, Georgia since December 8, 2008.  [*Id.* at 61.]  Dr. Tanner's primary diagnosis for Ms. St. Clare was anxiety disorder with symptoms of panic, anxiety, migraines, and fatigue, and her secondary diagnoses were fibromyalgia and chronic migraines.  [*Id.*]  Dr. Tanner had prescribed Ms. St. Clare anti-anxiety nutrients and expected her to improve in 6-8 months.  [*Id.* at 61-62.]

Unum requested medical records from Dr. Tanner, the salient parts of which are summarized below.

Ms. St. Clare initially sought treatment from Dr. Tanner in December 2008 for migraine headaches and panic attacks. [*Id.* at 47.] She also reported chronic pain, particularly in her neck and shoulders, vertigo, food sensitivities, and alcohol intolerance. [*Id.*]

Ms. St. Clare had laboratory testing on December 14 and 18, 2008. [Dkt. 41-3 at 50.] The results showed that Ms. St. Clare had decreased cortisol and DHEA as well as adrenal fatigue. [Dkt. 41-3 at 45.]

Ms. St. Clare saw Dr. Tanner on February 9, 2009, reporting daily panic attacks the previous week, and followed up on February 17, 2009. [Dkt. 41-3 at 43-44.] Ms. St. Clare reported that she had recently had a migraine and had slept all day before the second appointment. [*Id.*]

On March 11, 2009, Ms. St. Clare saw Dr. Tanner for an increase in headaches, lightheadedness, and panic after reporting that she had spent four days in bed. [Dkt. 41-1 at 18.] As a result of these symptoms, Dr. Tanner advised Ms. St. Clare to stop working, [dkt. 41 at 61], and Ms. St. Clare applied to Unum for STD benefits.

During her next office visit with Dr. Tanner on April 6, 2009, Ms. St. Clare reported that she was sleeping in the afternoon and that she had headaches, was shaky, and was tired. [Dkt. 41-1 at 17.] Dr. Tanner remarked that Ms. St. Clare just "came off Vicodin/Zyrtec/diet drinks." [Dkt. 41-1 at 61.]

Allergy testing performed in March 2009 indicated that Ms. St. Clare had a moderate sensitivity to cane sugar, mushroom, fructose, and honey. [Dkt. 41-2 at 6.] Dr. Tanner also performed two "Organix Comprehensive Profile tests" in March and April 2009. [Dkt. 41-1 at 19-

30.] The reports cautioned that "these tests are not intended for the diagnosis of specific disorders." [Dkt. 41-1 at 24.]

On April 30, 2009, Ms. St. Clare visited Dr. Tanner for a severe pustular rash on her face, and Dr. Tanner prescribed a nutritional protocol for gastrointestinal repair. [Dkt. 41-1 at 60.] Ms. St. Clare returned to Dr. Tanner approximately one month later and reported that she had "about the same or worse fatigue." [Dkt. 41-1 at 59.] Dr. Tanner noted that Ms. St. Clare had a rash on her leg, neck, and arm, and that she reported blurry vision. [*Id.*] Dr. Tanner prescribed supplements and vitamins, as well as a nutritional protocol. [Dkt. 41-2 at 11.] Dr. Tanner referred Ms. St. Clare to a neurologist at Emory to rule out a demyelinating disease like multiple sclerosis. [Dkt. 41-1 at 59.] Ms. St. Clare did not seek treatment from the neurologist.[2]

As part of Unum's analysis of Ms. St. Clare's STD claim, nurse clinical consultant Debbie Smith reviewed Ms. St. Clare's medical records and concluded that it was reasonable to conclude that the limitations Dr. Tanner placed on Ms. St. Clare in the APS were supported through June 9, 2009. [Dkt. 41-2 at 11.]

On June 1, 2009, Unum informed Ms. St. Clare that it approved her STD claim for the duration of her eleven-week policy. [Dkt. 40-2 at 35.] Unum subsequently paid Ms. St. Clare STD benefits for the time period of March 25, 2009, to June 9, 2009. [*Id.*] Unum informed Ms. St. Clare that since she may be eligible for long-term-disability benefits ("LTD"), it had forwarded her claim file for LTD consideration. [*Id.*] The notice informed Ms. St. Clare that she could help the process by "promptly providing any additional information we request" and that she

---

[2] Ms. St. Clare's father, Charles Reitsma, told an Unum representative in July 2009 that Ms. St. Clare did not seek treatment from the neurologist to rule out multiple sclerosis because Dr. Tanner indicated that even if Ms. St. Clare had multiple sclerosis, she was "already receiving treatments for this so [the diagnosis would not] really change her current treatment plan." [Dkt. 41-2 at 60.] Additionally, because there is no cure for multiple sclerosis, Mr. Reitsma commented that they felt "why bother." [*Id.*]

should "be aware, too, that payment of [STD benefits] does not automatically mean that your LTD claim will be approved."  [*Id.*]

### C.  Relevant Treatment During Long-Term-Disability Claim Review

Ms. St. Clare visited Dr. Tanner on June 18, 2009, and Dr. Tanner noted that although Ms. St. Clare was "feeling a little better," she was unable to drive due to headaches and dizziness and reported body pain in 11 out of 14 trigger-point areas.  [Dkt. 41-2 at 92.]  Dr. Tanner requested Epstein-Barr Virus ("EBV") testing and made note of considering a neurology referral. [*Id.*]

Unum conducted a telephone call with Ms. St. Clare's father, Charles Reitsma, on June 16, 2009.  [Dkt. 41-2 at 19-34.]  Mr. Reitsma noted that he had moved to Atlanta to help Ms. St. Clare with her activities of daily living as she was "confined to bed rest."  [*Id.* at 19.]  Mr. Reitsma informed Unum that Dr. Tanner had done many tests to find the cause of Ms. St. Clare's symptoms but that "nothing has been confirmed."  [*Id.* at 20.]  He told Unum that although Ms. St. Clare had been taking Vicodin, she had since stopped and was mainly taking supplements and vitamins as part of a more "holistic approach to her condition."  [*Id.* at 21.]

On July 7, 2009, Unum clinical consultant Nurse Nikki Kendall reviewed Ms. St. Clare's file and noted that although Dr. Tanner listed Ms. St. Clare's primary disabling diagnosis as anxiety disorder, there was no referral to a behavioral health specialist.  [Dkt. 41-2 at 50.]  Nurse Kendall also noted that the only medication prescribed, other than vitamins, was Adaptocrine, which reportedly helps decrease the impact of stress.  [*Id.*]  Although Nurse Kendall saw that Dr. Tanner made secondary diagnoses of fibromyalgia and migraines, she was unable to find any

documentation of tender/trigger points[3] and very limited information with the migraine diagnosis.  [*Id.*]  Nurse Kendall concluded that "[t]he severe debilitating symptoms described by [Ms. St. Clare's] father and [Ms. St. Clare] are inconsistent with the documentation in Dr. Tanner's records."  [*Id.*]

Ms. St. Clare spoke with Unum on July 14, 2009.  [Dkt. 41-2 at 75.]  She stated that "nothing ha[d] changed" and that she didn't understand why her opinion and Dr. Tanner's opinion weren't enough to support her claim.  [*Id.* at 75-76.]  Ms. St. Clare offered to be examined by Unum's doctors.  [*Id.* at 76.]

On July 16, 2009, Dr. Tanner noted in Ms. St. Clare's file that test results showed that Ms. St. Clare's EBV levels were positive and her blood contained a "pattern of antibodies suggestive of chronic or convalescent [EBV] infection," which Dr. Tanner believed likely caused Ms. St. Clare's "fatigue/fibro syndrome."  [Dkt. 41-2 at 91.]  Dr. Tanner recommended UVB light treatments and anti-viral treatment, a referral to an endocrinologist, continued rest, and immune support.  [*Id.*]

On July 20, 2009, Dr. Tanner responded to a request from Unum to clarify her opinion regarding Ms. St. Clare's medical condition.  [Dkt. 41-2 at 88-90.]  Dr. Tanner opined that Ms. St. Clare's "anxiety/panic disorder is not primary, but a part of her endocrine abnormalities as well as a component of chronic fatigue."  [*Id.* at 88.]  Dr. Tanner informed Unum that she had referred Ms. St. Clare to a behavioral health provider.  [*Id.*]  Dr. Tanner further opined that Ms. St. Clare's fatigue "has been debilitating" and that they were "working diligently to help restore

---

[3] It appears that Nurse Kendall did not have access to Dr. Tanner's notes from the June 18, 2009 visit at the time of her review because she did not summarize those notes in her clinical data portion of her report.

mitochondrial function and feel she will improve gradually to a return-to-work status." [*Id.* at 89.]

Unum on-site physician Dr. Freeman Broadwell III reviewed Dr. Tanner's July 20, 2009 response as well as her updated office notes and concluded that the work restrictions Dr. Tanner placed on Ms. St. Clare continued to be "unsupported by the medical evidence." [Dkt. 41-2 at 95.] Dr. Broadwell noted that Dr. Tanner's report that she had referred Ms. St. Clare to a behavioral health provider was unsupported by the record and needed to be clarified. [*Id.*]

On July 22, 2009, Ms. St. Clare told Unum that she did not understand what Dr. Tanner was referring to because she had not been referred to a behavioral health specialist and had not received any such treatment. [Dkt. 41-2 at 98.]

On July 24, 2009, Ms. St. Clare sought treatment from Dr. Judson G. Black, the endocrinologist to which Dr. Tanner had referred her. [Dkt. 41-4 at 17.] Dr. Black developed no objective findings or treatment plan, and Ms. St. Clare did not return to him for treatment. [*Id.* at 53.]

On August 6, 2009, Unum in-house physician Dr. Judith Cohen reviewed Ms. St. Clare's file. Dr. Cohen observed that Dr. Tanner "appears to be practicing what would not be considered standard medical care." [Dkt. 41-2 at 112.] Other than the one test regarding Ms. St. Clare's tender points, which Dr. Cohen acknowledged would meet the criteria for the diagnosis of fibromyalgia, Dr. Cohen observed that the documented exam findings were minimal. [*Id.*] Based on Ms. St. Clare's records to that point, Dr. Cohen concluded that they did not support Ms. St. Clare's limitations from a physical standpoint because "[t]he records do not provide a physical basis for the insured's reported complaints" and Ms. St. Clare had not followed through with recommendations to specialists from Dr. Tanner. [*Id.* at 113.] Dr. Cohen concluded that Ms. St.

Clare's complaints were out of proportion to the exam findings and test results noted by Dr. Tanner. [*Id.*]

On August 10, 2009, Unum sent a letter to Dr. Tanner requesting additional information. [Dkt. 41-3 at 39.] Dr. Tanner responded the following day and this time reported that she had not referred Ms. St. Clare to a behavioral health specialist. [*Id.*] She did confirm, however, that she had referred Ms. St. Clare to a neurologist and an endocrinologist. [*Id.*]

In response to a phone call from an Unum representative on November 2, 2009, Ms. St. Clare informed Unum that she had moved to her parents' home in Indiana two weeks prior. [Dkt. 41-4 at 59.] Unum conducted an in-home field interview three days later. [Dkt. 41-5 at 4.] Ms. St. Clare described her symptoms, her pain, and her limited daily activities. [Dkt. 41-5 at 4-11.] Ms. St. Clare remained seated throughout the almost two-hour interview. [*Id.* at 4.] She reported that she had not seen or obtained a new physician since moving to Indiana. [*Id.* at 8.] Mr. Reitsma was present during the interview and described how he had been assisting his daughter in her daily activities in various capacities for the previous year. [*Id.* at 5.]

On November 18, 2009, Dr. Cohen reviewed the field report from Unum's in-home visit with Ms. St. Clare and affirmed her previous opinion, concluding that Ms. St. Clare's records do not support her physical limitations. [Dkt. 41-5 at 22.]

Unum requested a records review from Dr. Charles McDonald to attempt to resolve the conflicting opinions of Drs. Tanner and Cohen. [Dkt. 41-5 at 25.] Dr. McDonald ultimately concurred with Dr. Cohen and concluded that the medical evidence did not support Ms. St. Clare's reported physical impairment to preclude full-time light physical work. [Dkt. 41-5 at 37.] Dr. McDonald noted that although the records indicate that Ms. St. Clare initially left work due to an anxiety disorder, she had not been seen by a behavioral health provider and "the possi-

bility of impairment based on behavioral health conditions needs to be addressed and assessed." [*Id.* at 37-38.] Dr. McDonald further observed that although Dr. Tanner had diagnosed Ms. St. Clare with adrenal fatigue, the diagnosis had not been substantiated by an endocrinologist and the requisite documentation of plasma cortisol measurements did not occur. [*Id.* at 37.] Dr. McDonald criticized the test Dr. Tanner used to diagnose Ms. St. Clare with adrenal fatigue and concluded that Ms. St. Clare was not receiving standard medical treatment for that condition. [*Id.*]

Additionally, although Ms. St. Clare saw endocrinologist Dr. Black once, Dr. McDonald noted that she did not return and Dr. Black was unable to provide an endocrinology basis for her disability. [*Id.*] Dr. McDonald noted that the medical documentation in Ms. St. Clare's file did not fulfill applicable diagnostic criteria for fibromyalgia for chronic fatigue syndrome. [*Id.* at 38.] Specifically, the listing of tender points is not associated with control-point testing and Ms. St. Clare had not seen a neurologist or been prescribed medications such as Lyrica. [*Id.*]

In December 2009, Unum obtained a behavioral health medical records review from Dr. Stuart Shipko, a specialist in psychiatry. [Dkt. 41-5 at 44.] Dr. Shipko concluded that there was no support for any restrictions and limitations from a psychiatric perspective. [*Id.* at 46.] Although Dr. Tanner had referenced Ms. St. Clare's symptoms of anxiety, Dr. Shipko concluded that there was no evidence of functional impairments due to mental illness and that if Ms. St. Clare had a functionally impairing psychiatric illness, she would have been in treatment or referred to a specialist. [*Id.* at 46-47.]

On January 8, 2010, Unum denied Ms. St. Clare's LTD benefits. [Dkt. 41-5 at 55.] Unum detailed its review of Ms. St. Clare's records and concluded that the records "do not provide a physical basis for your reported limitations." [*Id.* at 57.] Unum noted that exam findings have

been limited and much of the testing "would not be standard medical care." [*Id.*] Unum found various deficiencies in Ms. St. Clare's medical records, including that she had not been treated by a behavioral therapist, an endocrinologist, or a neurologist; that the medical documentation did not fulfill the American College of Rheumatology criteria for fibromyalgia; and that there had not been a psychological evaluation to rule out underlying depression. [Dkt. 41-5 at 57.] Based on these deficiencies, Unum denied Ms. St. Clare's LTD claim and claim for life insurance premium waiver.[4] [*Id.* at 58.] Unum did not request repayment of the LTD benefits it had made to Ms. St. Clare while it was determining her claim. [*Id.* at 56.]

### D. Ms. St. Clare's Appeal to Unum[5]

In May 2010, Ms. St. Clare appealed Unum's termination of her LTD benefits and her waiver of life insurance premium. [Dkt. 41-5 at 89.] In conjunction with her appeal, Ms. St. Clare provided a March 2010 report from Dr. Tanner detailing her treatment through September 2009. [Dkt. 42 at 6-8.] Dr. Tanner opined that Ms. St. Clare had primary diagnoses of chronic EBV and Chronic Fatigue Syndrome ("CFS") that are severe in nature. [*Id.* at 6.] Dr. Tanner noted that Ms. St. Clare had exhibited high levels on the EBV test on two occasions and that she also has 11 of 14 trigger points for fibromyalgia. [*Id.* at 7.] Dr. Tanner classified Ms. St. Clare's fatigue as severe and noted that she is unable to focus or concentrate for sustained periods, forc-

---

[4] Ms. St. Clare's request for relief includes a request that the Court reverse Unum's denial of her waiver of life insurance premiums. [Dkt. 56 at 52.] She does not substantively address this request in her briefing, likely because the Plan provides that if she does not meet the disability definition for LTD coverage, the life insurance premiums will not be waived. [Dkt. 42-4 at 26.] Because the Court affirms Unum's denial of Ms. St. Clare's LTD benefits, it will not separately address her appeal from the denial of insurance premium waiver.

[5] Ms. St. Clare referenced lab results from Dr. Carmen LeBlanc in her appeal letter, [dkt. 41-5 at 92]; however she admits that she did not actually submit the referenced records to Unum, [dkt. 73 at 17 n.3]. Given the deferential standard of review, the Court "is limited [to reviewing] to the information submitted to the plan's administrator." *Perlman v. Swiss Bank Corp. Comp. Dis. Protection Plan*, 195 F.3d 975, 982 (7th Cir. 1999).

ing bed rest.  [*Id.*]  Dr. Tanner opined that Ms. St. Clare "is unable to resume any type of gainful employment due to physical impairment and disability caused by Chronic [EBV] and [CFS]." [*Id.* at 8.]

Ms. St. Clare submitted records for treatment that she did not provide to Unum on its initial claim review.  She submitted a letter from Marilyn Manning, a massage therapist, who began treating Ms.St. Clare in March 2009.  [Dkt. 42 at 17.]  She also submitted chiropractic records from Dr. Kenneth McRae, who confirmed that he had treated her from March 2009 through June 2009 for neck pain, cervical myofascitis, and subluxation of the cervical spine.  [Dkt. 42 at 18.] She also submitted a letter from Dr. Richard Hilton with whom she began chiropractic treatment in November 2009 after relocating to Indiana.  [Dkt. 42 at 26.]  Dr. Hilton opined that Ms. St. Clare "is unable to perform the functions of her occupation because of physical impairment." [*Id.*]  Finally, Ms. St. Clare submitted a letter from David Graston, a provider[6] to whom Dr. Hilton referred Ms. St. Clare for muscle spasms in December 2009.  [Dkt. 42 at 27.]

Ms. St. Clare also provided Unum with medical records from Dr. Susan Holec-Iwasko, the treating physician with whom she began treatment on January 27, 2010—approximately three months after moving to Indiana.  [Dkt. 42 at 100-102; 42-1 at 1-77; 42-2 at 1-3.]  In a letter dated March 3, 2010, Dr. Holec-Iwasko advised Unum of her opinion that "Emily St. Clare has Fibromyalgia, Chronic Fatigue Syndrome (CFS), and Chronic Epstein-Barr Virus (EBV)."  [Dkt. 42 at 16.]  The medical records confirmed that Dr. Holec-Iwasko ordered blood tests for Ms. St. Clare in February 2010 and that three of four EBV pathogens tested in the high range.  [Dkt. 42-1 at 71.]  Dr. Holec-Iwasko ordered testing again in June 2010 and Ms. St. Clare's EBV pathogens again tested in the high range.  [Dkt. 42-2 at 41.]

---

[6] Unum notes that Mr. Graston is not a medical doctor.  [Dkt. 69 at 20.]

The records Ms. St. Clare submitted showed that she visited Dr. Holec-Iwasko 11 times between January 29, 2010 and June 9, 2010. [*See* dkt. 56 at 20 (citing visits).] Dr. Holec-Iwasko treated Ms. St. Clare by prescribing detoxification and dietary modifications, including the addition of nutritional, vitamin, and mineral supplementation. [*Id.*] Dr. Holec-Iwasko recommended treatment for Ms. St. Clare that included detox baths, massage, and light beam generator treatment. [Dkt. 42-1 at 14-15.]

On July 15, 2010, Unum's in-house nurse consultant Judy Wong reviewed Ms. St. Clare's claim. [Dkt. 42-3 at 45.] Nurse Wong observed that Drs. Tanner and Holec-Iwasko "employ an alternative medicine approach." [Dkt. 42-3 at 53.] Nurse Wong recognized that serial labs showed Ms. St. Clare had elevated EBV levels and that Ms. St. Clare had been diagnosed with mononucleosis at the age of eighteen, but Nurse Wong noted that "[t]here is no confirmed scientific evidence that the elevated EBV in the chronic or convalescent phase would be an etiology for [CFS], although some sources indicate that it is thought to play a role." [*Id.*] Nurse Wong emphasized that "[it] should be noted that the diagnoses of fibromyalgia and chronic fatigue syndrome are dependent on the absence of other conditions that would exhibit the same symptoms. In this case, there was little 'standard' medical testing done and primarily alternative medicine evaluations." [*Id.* at 53-54.] Nurse Wong offered no opinion regarding Ms. St. Clare's eligibility for disability benefits and referred the claim to one of Unum's medical consultants. [*Id.* at 54.]

On August 27, 2010, Dr. Laina Rodela, Board Certified in Internal Medicine, reviewed Ms. St. Clare's file for Unum. [Dkt. 42-3 at 98.] Dr. Rodela attempted to contact Drs. Hilton and Holec-Iwasko without success. [*Id.* at 101.] Dr. Rodela noted that radiographic testing had not been performed and that the other completed tests were not recognized by the medical litera-

ture as providing diagnostic data.  [*Id.*]  Other than the one trigger-point test Dr. Tanner performed in June 2009, Dr. Rodela noted that there were no other physical exams of that nature and no pain management referrals or prescribed medications.  [*Id.*]

Dr. Rodela disagreed with the treating doctors' diagnosis of EBV, noting that the laboratory results are more consistent with past exposure prevalent in the general population than with chronic EBV.  [Dkt. 42-3 at 101.]  Additionally, Dr. Rodela emphasized that although Ms. St. Clare's doctors based the CFS diagnosis on the EBV testing, that conclusion is unsupported by medical literature. [Dkt. 42-3 at 101.]  Dr. Rodela recognized that Ms. St. Clare had not had behavioral health treatment and that, despite a referral, she had not had neurological treatment. [Dkt. 42-3 at 101-102.]

Dr. Rodela ultimately concluded that Ms. St. Clare's diagnoses were unsupported and that her "complaints of fatigue, chronic pain and dizziness are in excess of the documentation and intensity of treatment."  [Dkt. 42-3 at 101.]  Dr. Rodela noted that the treatment of Drs. Tanner and Holec-Iwasko is "not considered standard care for treatment of [Ms. St. Clare's] complaints."  [Dkt. 42-3 at 102.]  Dr. Rodela concluded that Ms. St. Clare's functional impairment was not confirmed by physical exams or laboratory testing.  [*Id.* at 99-100.]

On September 8, 2010, Dr. Holec-Iwasko submitted a report in response to Dr. Rodela's request for additional information.  [Dkt. 42-4 at 3-5.]  Dr. Holec-Iwasko disagreed with Dr. Rodela's conclusion that Ms. St. Clare's EBV results were consistent with previous exposure prevalent in the general population.  [*Id.* at 3.]  Dr. Holec-Iwasko opined that Ms. St. Clare met the criteria to be diagnosed for CFS, noting that there was no evidence of behavioral health issues.  [*Id.* at 4.]  Earlier in the same letter,  Dr. Holec-Iwasko noted that Ms. St. Clare demonstrates "Psychological problems (depression, irritability, mood swings, anxiety, panic attacks)."

[Dkt. 69 at 23 (citing 42-4 at 4).]  Dr. Holec-Iwasko informed Unum that Ms. St. Clare attended up to three medical visits per week and that between her symptoms and her treatment, she "would be an unreliable employee at best if not completely absent."  [*Id.* at 5.]

Dr. Rodela responded to Dr. Holec-Iwasko's letter and opined that Dr. Holec-Iwasko had misinterpreted the EBV test results demonstrating increased levels.  [Dkt. 42-4 at 15.]  Dr. Rodela noted that chronic EBV infection "is seen in persons who demonstrate immune deficiency and require emergent, aggressive treatment for systemic infection."  [*Id.*]  Dr. Rodela concluded that Ms. St. Clare's clinical picture was not consistent with that diagnosis.  [*Id.*]  With regard to the CFS diagnosis, Dr. Rodela pointed to holes in Dr. Holec-Iwasko and Dr. Tanner's testing and also noted the inconsistency in Dr. Holec-Iwasko's letter regarding the presence or absence of psychological problems.  [*Id.* at 16.]  Dr. Rodela concluded that no information in Dr. Holec-Iwasko's response changed her opinion that the records did not support Ms. St. Clare's purported functional limitations.  [*Id.*]

On September 30, 2010, Unum informed Ms. St. Clare that it was denying her appeal for LTD benefits and the waiver of life insurance premium because it concluded that she did not meet the definition of disability under the policy.  [Dkt. 42-4 at 22.]  Unum's denial letter detailed the medical evidence and noted various reasons it was denying Ms. St. Clare's LTD claim, including the limited testing and documentation regarding the fibromyalgia, EBV, and CFS diagnoses; that there had been no referral for pain management; that Ms. St. Clare had not seen a behavioral health specialist despite documented symptoms of anxiety; that Dr. Holec-Iwasko had made contradictory conclusions regarding the presence or absence of behavioral health issues; that Ms. St. Clare had not been treated by a neurologist despite a referral; and that Drs. Tanner and Holec-Iwasko primarily treated Ms. St. Clare with supplements "that are not considered

standard medical care for treatment of Ms. St. Clare's complaints." [Dkt. 42-4 at 23-25.] For

these reasons, Unum denied Ms. St. Clare's appeal regarding the LTD benefits. [*Id.* at 25.]

## II.
### STANDARD OF REVIEW[7]

The parties do not dispute that the ERISA plan at issue grants Unum the discretionary au-

thority to make claims determinations pursuant to the terms of the Plan. [Dkts. 56 at 24; 69 at

29.] Under these circumstances, the Court applies a deferential standard, seeking to determine

only whether the administrator's decision was "arbitrary and capricious." *Holmstrom v. Metro.*

*Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010). This standard is synonymous with abuse of dis-

cretion. *Id*. at 767 n.7. Review under this deferential standard is not a rubber stamp, however,

and the Court will not uphold a termination of benefits when there is an absence of reasoning in

the record to support it. *Id.* at 766. ERISA requires that "specific reasons for denial be commu-

nicated to the claimant and that the claimant be afforded an opportunity for full and fair review

by the administrator."[8] *Id.*

---

[7] Although the parties filed cross-motions for summary judgment, they cite and apply the defer-
ential standard of review detailed herein, not the traditional summary judgment standard, [dkts.
56 at 23-25; 29-30], as is appropriate for the review of a denial of disability benefits, *see
Holmstrom v. Metro. Life Ins. Co.*, 615 F.3d 758, 766 (7th Cir. 2010) (applying deferential
standard of review without reference to traditional summary judgment analysis in disability ben-
efits review); *Davis v. Unum Life Ins. Co.*, 444 F.3d 569, 575-76 (7th Cir. 2006) (same).

[8] The parties disagree whether the Seventh Circuit Court of Appeals still equates the arbitrary
and capricious standard with whether the administrator's decision was "downright unreasona-
ble." [Dkts. 69 at 29 (Unum's brief advocating for application of the "downright unreasonable"
language); 73 at 3 (Ms. St. Clare's brief arguing that the Seventh Circuit no longer uses the
"downright unreasonable" language).] As the Seventh Circuit recently observed, that language
has merely been used as "a shorthand expression for a vast body of law applying the arbitrary-
and-capricious standard in ways that include focus on procedural regularity, substantive merit,
and faithful execution of duties." *Holstrom*, 615 F.3d at 766. Therefore, regardless of whether
or not the Court uses that language (which it does not in this decision), the arbitrary and capri-
cious standard of review remains the same.

### III.
#### DISCUSSION

Ms. St. Clare makes numerous challenges to Unum's decision to deny her benefits. Her two main arguments are that Unum failed to provide her claim with a full and fair review and that Unum's inherent conflict of interest as both the plan administrator and insurer unfairly affected the claims review process.

### A. Full and Fair Review

Within Ms. St. Clare's general argument that Unum failed to provide her claim a full and fair review, Ms. St. Clare raises four specific issues. First, she argues that Unum erred by denying her benefits after one of its clinical consultants found that her medical evidence warranted STD benefits. Second, she argues that Unum abused its discretion by not performing an independent medical exam ("IME") despite Ms. St. Clare's offer to have one. Third, Ms. St. Clare argues that Unum abused its discretion by failing to advise her of the information she needed to submit to perfect her claim. Fourth, she argues that Unum abused its discretion by arbitrarily disregarding her medical evidence and the opinions of her treating physicians.

### 1. Providing STD Benefits

Ms. St. Clare makes a cursory argument that it was improper for Unum to deny her LTD benefits after Nurse Smith, an Unum clinical consultant, recommended that she receive STD benefits. [Dkts. 56 at 38; 73 at 8.] Ms. St. Clare does not challenge Unum's reservation of rights; instead, she argues that it was improper for Unum to accept Dr. Tanner's care for purposes of the STD claim but reject it as non-standard care for purposes of the LTD claim. [*See* dkt. 73 at 10-13.]

The Court rejects Ms. St. Clare's argument that Unum's determination that she is not entitled to LTD benefits is arbitrarily adverse to its decision that she was entitled to STD benefits.

As Unum recognized, there are differences between the STD and LTD policies that may require a claimant to submit additional information to be awarded LTD. [Dkt. 40-2 at 35.] Additionally, Ms. St. Clare's claim evolved over time as her diagnosis and the available medical evidence developed. Dr. Tanner's initial primary diagnosis was anxiety disorder, [dkt. 41 at 61], but Dr. Tanner later opined that Ms. St. Clare's "anxiety/panic disorder is not primary, but a part of her endocrine abnormalities as well as a component of chronic fatigue," [dkt. 41-2 at 88.] On appeal, Dr. Tanner switched her diagnosis again and opined that Ms. St. Clare had primary diagnoses of chronic EBV and CFS. [Dkt. 42 at 6.] At the time Ms. St. Clare's STD benefits were approved, the severity of her initial symptoms was increasing and she had been referred to a neurologist. [*See* dkt. 41-2 at 11 (Nurse Smith's recommendation that Ms. St. Clare's STD benefits be approved "due to increasing severity of symptoms, inability to perform own [daily activities of living] and referral for neurological consult").] Ms. St. Clare ultimately decided not to seek treatment from the neurologist, which Unum did not know when it approved her STD benefits.

In sum, just as Ms. St. Clare's diagnoses evolved, so did her claim for benefits as she chose to continue certain treatments and forgo others. In light of this evolution and Unum's reservation of rights, the Court concludes that it was not arbitrary and capricious for Unum to deny Ms. St. Clare's LTD claim after approving her STD claim.

### 2. Not Performing an IME

Ms. St. Clare faults Unum for allowing its medical professionals to rely on a records review instead of performing an IME on Ms. St. Clare. [Dkt. 56 at 38, 42.] Unum argues that it was not required to perform an IME. [Dkt. 69 at 46.]

The Seventh Circuit Court of Appeals has rejected Ms. St. Clare's argument. In *Leger v. Tribune Co. Term Dis. Benefit Plan*, the Seventh Circuit reaffirmed its position that there is no

authority that prohibits "'the commonplace practice of doctors arriving at professional opinions after reviewing medical files.'" 557 F.3d 823, 832 (7th Cir. 2009) (quoting *Davis v. Unum Life Ins. Co. of Am.*, 444 F.3d 569, 577 (7th Cir. 2006)). Doctors are fully able to evaluate medical information from file reviews, balance the objective data against the subjective opinions of the treating physicians, and render an opinion without direct consultation with the claimant. *Id.* Therefore, the Seventh Circuit has held it to be reasonable for a plan administrator to rely on its doctors' assessments of a claimant's files to form an opinion, which saves the plan the financial burden of conducting repetitive tests and examinations. *Id.*

Based on applicable Seventh Circuit authority,[9] it was not arbitrary and capricious for Unum to rely on its doctors' review of Ms. St. Clare's medical records without conducting an IME to form opinions about Ms. St. Clare's alleged disability.

### 3. Failing to Advise Ms. St. Clare How to Perfect Claim

Ms. St. Clare argues that Unum failed to advise her how to perfect her claim, contravening ERISA law. [Dkt. 56 at 48-50.] Specifically, Ms. St. Clare contends that Unum did not advise what evidence or information she should submit to "cure the perceived deficiencies in its initial review of her claim." [*Id.* at 48.] Ms. St. Clare believes it was "impossible for her to discern what else she could submit during the claims process that Unum would deem sufficient enough to approve her claim of benefits" because she had already provided medical records, diagnostic tests, and consistent treatment with various medical providers. [*Id.* at 48-49.] Unum counters that its denials were sufficiently specific.

---

[9] While Ms. St. Clare cites a Ninth Circuit case allegedly supporting her position, [dkt. 56 at 42 (citing *Salomaa v. Honda Long Term Disability Plan*, 642 F.3d 666, 676 (9th Cir. 2011)], this Court is bound by the on-point Seventh Circuit authority (which *Salomaa* cites) rejecting Ms. St. Clare's argument.

ERISA sets forth certain minimum requirements for procedures and notification when a plan administrator denies a claim for benefits. For example, ERISA provides that every employee benefit plan shall provide adequate notice in writing to any participant whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial in a manner calculated to be understood by the participant. 29 U.S.C. § 1133. The Secretary of Labor has promulgated regulations that set forth more specifically the requirements of the notice of claim denial. In relevant part, the written adverse benefit determination shall include "[a] description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary." 29 C.F.R. § 2560.503-1(g)(iii). The Seventh Circuit Court of Appeals has recognized that "substantial compliance" with these requirements is sufficient. *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 690 (7th Cir. 1992).

Unum's initial LTD denial letter found the following deficiencies in Ms. St. Clare's medical records:

- No treatment from a behavioral health specialist;

- Exam findings limited and "much of the testing would not be standard medical care;"

- Diagnosis of adrenal insufficiency not substantiated by an endocrinologist;
  - No documentation of plasma cortisol measurements before and after cosyntropin stimulation;
  - Ms. St. Clare did not return to the endocrinologist to complete evaluation or undergo recommended endocrinology testing;

- Medical documentation did not fulfill the American College of Rheumatology criteria for fibromyalgia
  - Listing of tender points was not associated with control point testing;
  - No documentation of supervised aerobic conditioning exercises, occupational therapy, adaptive activities, or prescriptions such as Lyrica for treatment

- No psychological evaluation to rule out underlying depression; and

- No treatment by a neurologist.

[Dkt. 41-5 at 57.]  The denial letter included information regarding the appeals process and informed Ms. St. Clare that her entire claim would be reviewed on appeal, including any new information submitted, and an independent decision would be made.

After reviewing Unum's denial letter, the Court rejects Ms. St. Clare's argument that Unum did not inform her what she needed to do to perfect her appeal.  The denial letter makes it clear that Unum denied Ms. St. Clare's claim because, among other things, she had not received treatment from a behavioral therapist, she had not received a complete evaluation from an endocrinologist, and she had not received treatment from a neurologist.  [Dkt. 41-5 at 57.]  By denying Ms. St. Clare's claim on these bases and specifically noting that Unum did not consider the tests performed by Dr. Tanner to be "standard medical care," [*id.*], Unum sufficiently informed Ms. St. Clare that to perfect her appeal, she needed to document treatment from providers that Unum considered to be standard for her condition.  Unum's other criticisms about Ms. St. Clare's treatment were also very specific, including that there was no documentation of aerobic conditioning exercises, occupational therapy, massage therapy, or a pain prescription for Lyrica.  [Dkt. 41-5 at 57.]

Moreover, the Court notes that Ms. St. Clare's argument that it was "impossible for her to discern what else she could submit during the claims process" is overblown, especially considering that in response to Unum's denial, which pointed out that there were no records of massage therapy, Ms. St. Clare submitted records that she had been seeing a massage therapist.  [Dkts. 41-5 at 57; 42 at 17.]

For these reasons, the Court concludes that Unum substantially complied with the ERISA requirements for denying Ms. St. Clare's claim.

#### 4. Ms. St. Clare's Medical Evidence

Ms. St. Clare argues that Unum arbitrarily disregarded her medical evidence. She challenges Unum's interpretation of the phrases "regular care" and "generally accepted medical standards" and contends that Unum arbitrarily ignored evidence of her medical conditions and rejected the opinions of her treating physicians.

##### a. The Phrases "Regular Care" and "Generally Accepted Medical Standards"

Unum denied Ms. St. Clare's LTD request in part because it determined that she did not provide proof that she was under the "regular care" of a physician, as required by the Plan.[10] [Dkt. 69 at 30.] Again, the Plan defines "regular care" to mean:

> • you personally visit a physician as frequently as is medically required, according to <u>generally accepted medical standards</u>, to effectively manage and treat your disabling condition(s), and

> • you are <u>receiving the most appropriate treatment and care which conforms with generally accepted medical standards</u>, for your disabling condition(s) by a physician whose specialty or experience is the most appropriate for your disabling condition(s), according to generally accepted medical standards.

[Dkt. 41 at 116 (emphases added).]

Ms. St. Clare emphasizes that the Plan does not define the term "generally accepted medical standards" and argues that the phrase is ambiguous. [Dkt. 73 at 8.] Because Ms. St. Clare contends that the phrase is ambiguous, she believes that it should be interpreted against Unum as the drafter of the Plan. [Dkt. 73 at 8 (collecting cases).]

Unum points out that the Plan gives Unum sole discretion to interpret and enforce the Plan's terms. [Dkt. 41 at 124.] Although ambiguities in an insurance policy are generally con-

---

[10] Although Ms. St. Clare contends that Unum asserts for the first time on appeal that it denied her benefits on this basis, it is clear from the denial letters citing the "regular care" provision and concluding that Ms. St. Clare was receiving non-standard medical care that Unum relied on this provision to deny Ms. St. Clare's claim. [Dkts. 41-5 at 51, 59; 42-4 at 24-25.]

strued in favor of an insured, in the ERISA context where a plan administrator has been empowered to interpret the terms of the plan, that rule does not apply. *Marrs v. Motorola, Inc.*, 577 F.3d 783, 787 (7th Cir. 2009). Instead, when an ERISA plan gives the plan administrator discretion to interpret its terms, the Court can reject the administrator's interpretation "only if it is unreasonable." *Id.* at 786.

Even assuming that the phrase at issue is ambiguous, the Court concludes that Unum's interpretation of "regular care" and "generally accepted medical standards" to exclude treatment from Ms. St. Clare's physicians who were practicing alternative medicine was not unreasonable. Unum's investigation and subsequent denial letters make it clear that it interpreted those phrases to require treatment from medical providers such as an endocrinologist, a behavioral therapist, and a neurologist under these circumstances. [Dkt. 41-5 at 57.] Dr. Tanner was a specialist in environmental medicine and Dr. Holec-Iwasko was a doctor of osteopathic medicine. As detailed at length in the background section of this opinion, both doctors primarily treated Ms. St. Clare through nutrient therapy, detoxification, and light beam generator therapy. They did not prescribe pain management medication or conduct tests to rule out other possible diagnoses for Ms. St. Clare's symptoms. Ultimately, three of Unum's physicians (Drs. Cohen, McDonald, and Rodela) as well as one of its nurses (Nurse Wong) concluded that Ms. St. Clare was not receiving standard medical care for the conditions with which she had been diagnosed. [Dkts. 41-2 at 112; 41-5 at 37; 42-3 at 102.]

Moreover, Ms. St. Clare's father told Unum during an interview that "they like the idea and treatment from Dr. Tanner because it doesn't have the side effects of regular medicine." [Dkt. 41-2 at 60.] The fact that Mr. Reitsma, who was intimately involved with his daughter's care, referred to her treatment as something other than "regular medicine" bolsters the reasona-

bleness of Unum's conclusion that Ms. St. Clare was not receiving regular care as defined by the Plan.

For these reasons, the Court concludes that Unum's interpretation of the phrases "regular care" and "generally accepted medical standards" to exclude the alternative treatment Ms. St. Clare received was not unreasonable.

### b. Rejecting Evidence

Ms. St. Clare argues that Unum arbitrarily disregarded the opinions of her treating physicians and the effects of her conditions. Ms. St. Clare emphasizes that she submitted a "wealth of medical evidence" to support her claim, [dkt. 56 at 41], including objective diagnostic testing, but that Unum denied her claim "in light of the compelling, detailed and unequivocal evidence she presented," [*id.* at 41-42, 37-38].

The argument that "the opinions of treating physicians deserve special consideration in benefits determinations" has been "rejected." *Leger*, 557 F.3d at 832. Although plan administrators cannot arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003).[11] A plan's determination, however, still must have a reasoned basis, and administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including opinions of a treating physician. *Holmstrom*, 615 F.3d at 775.

---

[11] Ms. St. Clare cites various cases for the principle that information provided by a treating physician is superior to information generated by an insurer's medical consultant, [dkt. 56 at 46 (collecting cases], but those cases were all issued before the United States Supreme Court's pronouncement in *Nord* that special weight need not automatically be given to a treating physician.

A plan administrator does not need to delve into medical evidence that is irrelevant to its primary concern. *Majeski v. Metro. Life Ins. Co.*, 590 F.3d 478, 484 (7th Cir. 2009). Nor must plan administrators annotate every paragraph of a thousand-page medical record. *Id.* Instead, a plan administrator's decision is not reasonable if it ignores, without explanation, "substantial evidence that the claimant has submitted that addresses what the plan itself has defined as the ultimate issue." *Id.*

Based on its review of the records cited by the parties and Unum's denial letters, the Court concludes that Unum did not arbitrarily reject Ms. St. Clare's evidence. Instead, Unum acknowledged Ms. St. Clare's evidence but provided a detailed explanation why it did not agree that the evidence supported her claimed disability. Unum found the limited evidence of medical testing troubling, given that Ms. St. Clare's diagnoses relied almost exclusively on her self-reported complaints without conducting tests to rule out other possible diagnoses like multiple sclerosis. Additionally, Dr. Holec-Iwasko's report was inconsistent on whether or not Ms. St. Clare had behavioral health issues, [dkt. 42-4 at 3-4], and inconsistencies in a treating physician's opinion support an administrator's decision to rely on its reviewing physicians, *Davis*, 444 F.3d at 578. As detailed at length above, Unum's reviewing physicians provided detailed reasons for disagreeing with Ms. St. Clare's doctors' interpretations of the limited test results and why they believed that the records did not support her claim for LTD benefits.

Perhaps most importantly, Unum's initial denial letter concluded that Ms. St. Clare was not receiving regular medical care pursuant to generally accepted medical standards, as required by the Plan. [Dkts. 41-5 at 57; 42-4 at 22-25.] As detailed above, Unum had the discretion to interpret the Plan phrases "regular care" and "generally accepted medical standards," and under these circumstances, its conclusion that Ms. St. Clare was not receiving regular care was not un-

reasonable.[12]  Although there may be a wealth of medical records in this case, the records indi-
cate that Ms. St. Clare did not receive what Unum considered to be generally accepted medical
treatment for her conditions from an endocrinologist, a behavioral therapist, or a neurologist, de-
spite Unum's reasoning in its initial denial letter.  Because she did not do so, Unum denied her
appeal.  [*See* dkt. 42-4 at 23-25 (denying Ms. St. Clare's appeal because, among other things,
there was no documentation of treatment by a behavioral health specialist or a neurologist).]  Ms.
St. Clare repeatedly emphasizes the unequivocal support Drs. Tanner and Holec-Iwasko gave
regarding the debilitating effect that her conditions had on her ability to work, but she ignores
that because it was not unreasonable for Unum to interpret the Plan to exclude alternative care,
the unequivocal support of Ms. St. Clare's physicians is not enough to save her claim.[13]

In sum, had Ms. St. Clare been treated by standard medical providers after Unum denied
her LTD claim for not receiving regular care, her case would be much stronger.  Because she did
not, and given the deferential standard of review the Court must apply in conjunction with Un-
um's detailed explanation for its decision, the Court rejects Ms. St. Clare's argument that Unum
selectively disregarded her medical records and the opinions of her treating physicians.

---

[12] Ms. St. Clare cites two cases from other district courts to support her argument that "Unum has
a history of discounting [EBV] and [CFS] as disabling conditions."  [Dkt. 56 at 44-45 (citing
*Strope v. Unum Provident Corp.*, 2010 WL 1257917 (W.D.N.Y. 2010); *Nickel v. Unum Life Ins.
Co. of Am.*, 582 F. Supp. 2d 869 (E.D. Mich. 2008)).]  *Strope* and *Nickel* are distinguishable from
Ms. St. Clare's case, however, because Unum did not deny benefits to those claimants because
they were not seeking regular medical care pursuant to generally accepted medical standards.

[13] Likewise, contrary to Ms. St. Clare's assertions, [dkts. 73 at 29-30], Unum did not have to ex-
plain how she would be able to do her job given her physical limitations because it was not un-
reasonable for it to interpret the language of the Plan to exclude her alternative care.  In other
words, Unum did not necessarily dispute the effect of Ms. St. Clare's conditions; it denied her
claim because she did not receive the standard medical care necessary to treat her conditions.

### B. Conflict of Interest

Ms. St. Clare argues that Unum has a financial conflict of interest as both the administrator and the insurer of her claim that materially affected its resolution of her claim. As support for her argument, she points to alleged financial incentives for Unum's employees to deny claims and for its in-house doctors to find claimants not to be disabled. [Dkts. 56 at 26-34; 73 at 32-33.]

The Court must take a "conflict of interest into account," but the administrator "remains entitled to the deference normally afforded under the arbitrary and capricious standard." *Black*, 582 F.3d at 745. Because an administrative conflict of interest exists in almost all ERISA cases, the Court must not focus on the existence of the conflict but, instead, on the "gravity" of the conflict. *Majeski*, 590 F.3d at 482. This includes reviewing "the circumstances of the case, including the reasonableness of the procedures by which the plan administrator decided the claim, any safeguards the plan administrator has erected to minimize the conflict of interest, and the terms of employment of the plan administrator's staff that decides benefit claims." *Id.* (citing *Marrs v. Motorola*, 577 F.3d 783, 789 (7th Cir. 2009)). The administrator's conflict of interest might prove to be "tiebreaking" in a case where the circumstances suggest a higher likelihood that the conflict affected the benefits decision. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008).

The Court need not extensively analyze Ms. St. Clare's arguments regarding Unum's conflict of interest because based on its analysis of the record and the issues presented by the parties, the Court does not find this to be a close case requiring a tiebreaker. Ms. St. Clare's most specific argument regarding Unum's potential conflict is that Unum employees were rewarded for returning claimants to work. As a general matter, the Court finds nothing nefarious about a Plan provider returning an insured to a productive life, if possible. And while Ms. St. Clare argues that Unum's financial interest conflicts with its fiduciary duty to act solely in her

interest as a plan participant, she ignores the duty the Plan also has to other plan participants to maintain the financial integrity of the plan by, for example, not paying unsupported claims. *See LaRue v. DeWolff, Boberg & Assocs.*, 552 U.S. 248, 253 (2008) (noting that ERISA's fiduciary obligations "relat[e] to the plan's financial integrity" and "reflec[t] a special congressional concern about plan asset management"); *Sharp Elecs. Corp. v. Metro. Life Ins. Co.*, 578 F.3d 505, 514 (7th Cir. 2009) (emphasizing the importance of "protect[ing] the financial integrity of pension and welfare plans by confining benefits to the terms of the plan as written"). The Court does not find that Unum got the balance wrong in this case.

Since there is no persuasive evidence that Unum's conflict affected its adverse benefits decision in this case, there is no tie to be broken here and the Court need not analyze the potential conflict issue further.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court **DENIES** Plaintiff Emily St. Clare's Motion for Summary Judgment, [dkt. 55], and **GRANTS** Defendants Motion for Summary Judgment, [dkt. 68]. Judgment will enter accordingly.

05/11/2012

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Kimberly A. Jones
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C.-Chicago
kimberly.jones@ogletreedeakins.com

Eric P. Mathisen
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. - Valpo

eric.mathisen@ogletreedeakins.com

Bridget L. O'Ryan
O'RYAN LAW FIRM
boryan@oryanlawfirm.com

Mark E. Schmidtke
OGLETREE DEAKINS NASH SMOAK & STEWART, P.C. - Valpo
mark.schmidtke@ogletreedeakins.com

Amanda Lynn Yonally
O'RYAN LAW FIRM
ayonally@oryanlawfirm.com